**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| William Mosher, | No. CV-22-00833-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| J. Alexander and E. Wick, | |
| Defendants. | |

Pending before the Court is Defendants Officer Jacob Alexander and Officer Evan Wick's Motion for Summary Judgment (Doc. 104).  After reviewing the briefing, the Court **grants** Defendants' Motion for the following reasons.

## I.      BACKGROUND

At this stage of the proceedings, only one count of excessive force remains against Defendants Alexander and Wick.  (Doc. 96 at 2.)  The pertinent facts are as follows.

On July 7, 2021, Defendant Wick—working in conjunction with the United States Marshals Service's Violent Offender Unit ("VOU")—was conducting surveillance on a residence associated with James Wheaton.  (Doc. 101 at 3 ¶¶ 1, 15.)  Wheaton, six days earlier, had "threatened to kill himself and his girlfriend during an altercation and fired a round into the ceiling before fleeing."  (Docs. 104 at 2; 115 at 3 ¶ 8.)  Defendant Wick observed Plaintiff pick up James Wheaton.  (Doc. 101 at 3 ¶¶ 15–16.)  Before Wheaton entered Plaintiff's car, Defendant Wick witnessed Wheaton return to the residence and retrieve a gun.  (Doc. 101 at ¶ 17–18.)  Defendant Wick radioed the other officers that

Wheaton was armed. (*Id.* ¶ 19.) Officers ran Plaintiff's vehicle information and put out over the radio that there were misdemeanor arrest warrants for Plaintiff. (*Id.* ¶ 21; Doc. 115-10 at 7.)

Officers followed Plaintiff's car to an intersection, then performed a four-vehicle containment maneuver to stop the vehicle. (Doc. 118 at 3.) After containing Plaintiff's vehicle, officers witnessed and broadcasted over the radio that Wheaton reached under his seat. (Doc. 101 at 5 ¶ 39.) Plaintiff began swearing at the officers and yelled at bystanders to save him, that the officers got the wrong people, and that the officers were trying to kill him. (*Id.* ¶¶ 42, 44; Doc. 115 at 11 ¶ 44.) However, Plaintiff did not threaten physical harm to the officers. (Docs. 104 at 4; 115 at 33 ¶ 32.) Given the firearm previously observed with Wheaton, officers then directed Plaintiff to crawl out of the driver-side window because it would necessitate the use of both his hands and prevent him from accessing a potential weapon. (*Id.* ¶¶ 40–41.)

A bystander video shows Plaintiff then crawl out of his window and across the roof of one of the officer's vehicles, jump to the pavement, and then immediately use both hands to grab the bottom of his shirt and expose his full stomach and chest to the officers. (Doc. 101 Ex. 6 at 2:11–2:15.) An officer then fired a beanbag shotgun round and hit Plaintiff's side. (Doc. 101 at 6 ¶ 51; 115 at 32 ¶ 24.) The parties dispute the commands given to Plaintiff prior to this shot. Plaintiff contends he was commanded to show he did not have a weapon, so he "reached down and lifted his shirt to show the officers he had no weapons in his waistband." (Doc. 118 at 3.) Defendants state they did not give this command but instead directed Plaintiff "to exit the vehicle and face away from the officers with his hands raised." (Doc. 104 at 5.)

The bystander video then shows Plaintiff, after being hit with the first beanbag round, turn and take approximately four steps away from the officers. (Doc. 101 Ex. 6 at 2:15–2:17.) Defendant Alexander then shoots a beanbag round into Plaintiff's left buttock. (Docs. 101 at 7 ¶ 54; 115 at 17 ¶ 54.) After being hit with the second beanbag round, officers commanded Plaintiff to stop, get on the ground, and lay on his stomach.

- 2 -

(Docs. 101 at 8 ¶ 57; 115 at 19 ¶ 57.)  The parties dispute Plaintiff's next movements. Plaintiff states he dropped to the ground "in a seated position," leaned forward, and "covered his head with his still-empty hands," wherein Defendant Wick leaned out his window and tased Plaintiff for "five seconds." (Doc. 118 at 3.)  Defendants allege Plaintiff "turned and walked toward the intersection" toward Defendant Wick's vehicle, wherein Defendant Wick rolled down his window and deployed his taser.  (Doc. 104 at 6.)

Plaintiff contends that Defendant Alexander's use of the second beanbag round and Defendant Wick's use of the taser constitutes excessive force.  Defendants now move for summary judgment, arguing their conduct was objectively reasonable.

## II.    LEGAL STANDARD

Summary judgment is appropriate in circumstances where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of a case under the applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual disputes are genuine when the evidence could allow a reasonable jury to find in favor of the nonmoving party.  *Id.*  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or by showing "that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A)–(B).  Additionally, the Court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When considering a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The Court must draw all reasonable inferences in the nonmovant's favor.  *Anderson*, 477 U.S. at 255.  Additionally, the Court does not make credibility determinations or weigh the evidence.  *Id.*  "[T]he determination of whether a given factual dispute requires submission to a jury must be guided by the substantive

evidentiary standards that apply to the case." *Id.*

The burden initially falls on the movant to demonstrate the basis for a motion for summary judgment and "identify[] those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. If this initial burden is not met, the nonmovant does not need to produce anything even if they would have the ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). However, if the initial burden is met by the movant, then the nonmovant has the burden to establish that there is a genuine issue of material fact. *Id.* at 1103. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Zenith Radio Corp.*, 475 U.S. at 586. Bare assertions alone do not create a material issue of fact, and "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

## III.    DISCUSSION

Defendants contend that summary judgment should be granted because they are entitled to qualified immunity as a matter of law. Defendants argue that: (1) Plaintiff cannot assert a § 1983 claim against Defendant Wick because he was a federally deputized actor at the time; (2) Defendant Alexander's bean-bag deployment was objectively reasonable; and (3) Defendant Wick's taser deployment was objectively reasonable. (Doc. 104 at 2.) Although the Court finds that a jury could conclude that Defendant's use of force was unreasonable, Plaintiff fails to demonstrate that the rights violated were clearly established. Therefore, the Court agrees that Defendants are entitled to qualified immunity.

### A. Defendant Wick and § 1983

Plaintiff's only remaining claim against Defendant Wick is for excessive force under 42 U.S.C. § 1983. (Doc. 70 at 5–6.) A § 1983 claim must establish that a defendant acted under color of state law. *WMX Techs., Inc. v. Miller*, 197 F.3d 367, 372 (9th Cir. 1999) (en banc). Defendants argue that Plaintiff cannot maintain a § 1983 claim against Officer Wick because Officer Wick was a federally deputized United States Marshal's

Service Task Force officer at the time of the arrest, and thus acting as a federal agent under federal law. (Doc. 104 at 10–11.) Plaintiff responds that Defendants cannot escape their previous stipulation that Officer Wick was acting under color of state law. (Doc. 118 at 6.) The Court agrees and will enforce Defendant's stipulation here.

On November 30, 2023, the parties jointly stipulated to dismissing Plaintiff's state claims for assault and battery against the Officers because Plaintiff failed to serve a timely notice of claims. (Doc. 39 at 2.) The Officers stipulated that service was necessary because they were acting under the color of state law. (*Id.*) The stipulation reads as follows:

> William Mosher and Defendants City of Mesa, Jacob Alexander, Evan Wick, and TA Sullivan hereby stipulate as follows:
>
> . . . .
>
> Because Alexander, Wick, and Sullivan *were acting under color of state law* as "public employees" during the events alleged in the Amended Complaint, and because Plaintiff did not personally serve them with a notice of claims within 180 days of the accrual of his claims for assault and battery, Plaintiff's claims for assault and battery against those defendants must be dismissed.

(*Id.* (emphasis added).) Defendant Wick's attorney signed this stipulation. (*Id.*) Pursuant to Local Rule of Civil Procedure 83.7, an agreement between parties is binding if "it is in writing signed by the attorney of record." The Court may only reject such agreements "in the interests of justice." Local R. Civ. P. 83.7. Such interests are not implicated here.

Defendants' arguments are notably opportunistic. Presently, Defendants argue that the parties may not stipulate whether an officer was acting under the color of state law because only the Court may reach this conclusion. But this did not stop Defendants from doing so before where it proved advantageous. The Court finds it troubling that Officer Wick may stipulate to acting under color of state law to gain the benefit of dismissing Plaintiff's state law claims, and then turn around and argue that he is acting under color of federal law to gain the benefit of dismissing Plaintiff's federal claim. Justice does not require the Court to let Defendants have it both ways.

Moreover, the Court is not convinced that such stipulations are impermissible. *See, e.g., Coffey v. Pierce County*, 191 F.3d 459, 463 (9th Cir. 1999) (unpublished) (analyzing plaintiff's § 1983 claim and noting that the defendants "stipulated that they were at all

relevant times acting under color of state law"); *Beaver v. City of Federal Way*, 507 F. Supp. 1137, 1143 (W. D. Wash. 2007) (analyzing only the excessive force element of plaintiff's § 1983 claim because "the parties have stipulated that [the officers] were acting under color of state law"); *Rush v. Weinstein*, No. 1:18-CV-00073-REP, 2022 WL 17487740, at *5 & n.8 (D. Idaho Dec. 7, 2022), *aff'd*, No. 23-35018, 2023 WL 7381459 (9th Cir. Nov. 8, 2023) (noting the jury's limited role in evaluating the plaintiff's § 1983 claim because the "[t]he parties have stipulated that each Defendant acted under color of state law"); *Pruitt v. County of Sacramento*, No. CIV.2:10-0416 WBS KJ, 2010 WL 3717302, at *2 (E.D. Cal. Sep. 15, 2010) (dismissing plaintiff's *Bivens* claims because defendants "stipulated that the individual named defendants were all acting under color of state law at all times").

Therefore, as to the present Motion, the Court will hold Defendant Wick to his stipulation that he was acting under color of state law.  Accordingly, the Court will evaluate Plaintiff's § 1983 claim against both Defendant Alexander and Defendant Wick.

**B.  Qualified Immunity**

"An officer asserting a defense of qualified immunity should be denied summary judgment if (1) the evidence, taken in the light most favorable to the party asserting injury, shows that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood his conduct to be unlawful in that situation." *Johnson v. Myers*, 129 F.4th 1189, 1193 (9th Cir. 2025) (citation modified).  The Court addresses each prong in turn, considering the totality of the circumstances. *Barnes v. Felix*, 605 U.S. 73, 80 (2025).

1. *Violation of a Constitutional Right*

The use of force to effect an arrest is examined under the Fourth Amendment's prohibition on unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394 (1989). "In evaluating a Fourth Amendment claim of excessive force, courts ask 'whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them.'" *Glenn v. Washington County*, 673 F.3d 864, 871 (9th Cir. 2011) (quoting *Graham*,

490 U.S. at 397). This inquiry seeks to balance the "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). However, this determination must be made "without the benefit of 20/20 hindsight." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014). Instead, reasonableness is judged from the perspective of an officer on the scene because "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

When assessing the severity of an officer's intrusion on an individual's Fourth Amendment right, courts follow a three-step approach: (1) identify the nature of the intrusion; (2) examine the governmental interest in the use of force; and (3) weigh the gravity of the intrusion against the government's interest. *Glenn*, 673 F.3d at 871. Importantly, this inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," thus "summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

### a. Nature of the Intrusion

This first step requires the Court to consider "the quantum of force used" when Defendant Alexander fired a beanbag round and when Defendant Wick deployed his taser. *See Glenn*, 673 F.3d at 871. The Court begins with Defendant Alexander.

"A beanbag shotgun is a twelve-gauge shotgun loaded with beanbag rounds, which consist of lead shot contained in a cloth sack." *Id.* (citation modified). Such weapons are considered less lethal, rather than non-lethal, because "the bean bags can cause serious injury or death if they hit a relatively sensitive area of the body, such as the eyes, throat, temple or groin." *Id.* (citation modified). The Ninth Circuit notes that "the euphemism 'beanbag' grossly underrates the dangerousness of this projectile, which can kill a person

if it strikes his head or the left side of his chest at a range of under fifty feet." *Id.* (citation modified).  Accordingly, deployment is only reasonable "when a strong governmental interest compels the employment of such force." *Id.* (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001).

The distance at which Defendant Alexander deployed the beanbag round is also relevant.  *See Deorle*, 272 F.3d at 1279.  For purposes of this Order, the Court accepts Plaintiffs allegation that defendant Alexander shot him from a distance of approximately ten feet. (Docs. 118 at 9; 115 at 33 ¶ 37.)  Defendants do not contest this allegation in their Motion, Statement of Facts, or Reply.  As noted, a beanbag shotgun has a "lethal range" of approximately fifty feet.  *See id.*

The actual harm Plaintiff suffered is also "certainly relevant in evaluating the degree of the Fourth Amendment intrusion." *Nelson v. City of Davis*, 685 F.3d 867, 879 (9th Cir. 2012) (citation modified).  Defendants state that "Plaintiff has not produced any competent medical evidence tying the use of the Taser, or bean-bag, to any serious injury.  The only thing Plaintiff has done is provided photographs of bruising on his buttocks and <u>one</u> small Taser mark." (Doc. 122 at 6.)  Plaintiff includes a photo of the bruise on his left buttock caused by Defendant Alexander.  (Docs. 115 at 37–38 ¶ 65; 115-2 at 7–8.)  This image depicts a discolored bruise approximately eight-by-eight centimeters in size.  Plaintiff also states that he spent three days in the hospital following this incident, but he does not include any medical record explaining the extent of his injuries or the necessary treatment.

Turning to Defendant Wick.  The Ninth Circuit holds that a taser, "when used in dart-mode[,] constitute[s] an intermediate, significant level of force that must be justified by the governmental interest involved." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).  A taser shot is a non-lethal force intended to deploy electrical impulses to override a "victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless." *Id.* at 824.  The Ninth Circuit characterizes a taser shot as a "painful and frightening blow," but recognizes its use "can obviate the need for more severe, or even deadly, force and thus can help protect police officers, bystanders, and

suspects alike." *Id.* at 826.

Here, Defendants argue that the intrusion is minimal because Defendant Wick's taser shot did not strike Plaintiff with both prongs and thus did not deliver an electric shock because a circuit could not be completed. (Doc. 104 at 22–23.) Therefore, Defendants argue the Court should only evaluate for the pain of being hit by one prong. (*Id.*) Defendants state that a bystander video supports this narrative, noting that Plaintiff was still moving around and did not stiffen up after Defendant Wick deployed his taser. (Docs. 104 at 23; 101 at 9–10 ¶¶ 68–73.) Additionally, Defendants point to a photo taken of Plaintiff after the incident that appears to show an injury from only one taser probe. (Doc. 101 at 10 ¶ 73; 101-2 at 139.) Contrariwise, Plaintiff avers that he was shocked. (Doc. 118 at 9–10.) He states he "was struck by at least one taser probe on his side," and "received an electric shock, causing him to collapse onto the ground and move his limbs stiffly." (*Id.* at 9.)

After viewing the video evidence, the Court finds it could reasonably support Plaintiff's claim. The bystander video appears to show that Plaintiff was seated and crouched near Defendant Wick's driver's side door immediately prior to Defendant Wick deploying his taser. (Doc. 101 Ex. 6 at 2:18–2:19.) After Defendant Wick deploys his taser, Plaintiff then suddenly lays straight on his back, seemingly immobilized. (*Id.* at 2:20.) Plaintiff remains in this position, and his left arm does not appear to move for approximately three seconds. (*Id.* at 2:20–2:23.) Viewing this evidence in a light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff was electrocuted by Defendant's taser.

Accordingly, a reasonable jury could find that Defendant Alexander's use of a beanbag round must be justified by a strong governmental interest given the dangerousness of the projectile, the short distance, and the clear injury to Plaintiff. Additionally, a reasonable jury could find that Defendant Wick's use of a taser electrocuted Plaintiff and thus constituted an intermediate quantum of force necessitating an equally sufficient governmental interest.

b.  Governmental Interest

Courts evaluate the government's interest in the use of force by examining "three core factors": (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.  *Bryan*, 630 F.3d at 826. The most important factor is whether the suspect posed an immediate threat to the safety of the officers or others.  *Smith*, 394 F.3d at 702.  But "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."  *Deorle*, 272 F.3d at 1281.

### i.  Severity of the Crime

At this step, the Court's inquiry "is an objective test that depends on whether a reasonable officer would have concluded a serious crime was occurring."  *Conley v. City of Eugene*, No. 6:22-CV-01144-MTK, 2025 WL 1549188, at *8 (D. Or. May 30, 2025) (citing *Lowry v. City of San Diego*, 858 F.3d 1248, 1257–58 (9th Cir. 2017)).  To this point, Defendants highlight that Plaintiff "blocked the view of Wheaton, erratically jumped out of the vehicle and jerked his hands to his waistband, refused to comply with commands, and walked away from officers." (Doc. 104 at 16.)  Therefore, Defendants contend that Plaintiff's behavior created reasonable suspicion that Plaintiff was intentionally obstructing the investigation or creating a means of escape. (*Id.*)  Additionally, Defendants argue that Plaintiff's quick movements to his waistband "would cause a reasonable officer to believe that an aggravated assault was imminent." (*Id.* at 17.)  The Court finds there are material facts that genuinely dispute these claims.

Defendants cite Defendant Wick's testimony to support their claim that Plaintiff was obstructing the investigation. (Doc. 101 at 6 ¶ 45.)  Defendant Wick testified that he believed Plaintiff stuck his hands outside of the driver's side window before crawling out of the car to obstruct the officers' view of what was going on inside the car. (Doc. 101-1 at 51–52.)  However, Defendants also admit that prior to the beanbag deployments, officers gave Plaintiff "multiple commands to put and keep his hands up." (Doc. 101 at 8 ¶ 59.)

Thus, a jury could conclude that a reasonable officer would perceive Plaintiff raising his hands outside the car as compliance rather than obstruction. Although Defendants attempt to bolster this claim by citing the bystander video generally, (*id.* at 10 ¶ 75), the video is not particularly illuminating of this point. The video is taken from across the street and barely shows the top portion of Plaintiff's driver's side window. From this angle, the video only depicts Plaintiff leaning out the window with both arms while conversing with the officers then begin crawling out the window. (Doc. 101 Ex. 1 at 1:50–2:07.) Little else can be drawn from the video regarding Plaintiff's potential obstruction other than these observations.[1]

Next, Defendants cite Defendant Wick's testimony to support their claim that Plaintiff was attempting to escape/evade arrest. (*Id.* at 9 ¶ 63.) Defendant Wick testified that he viewed Plaintiff from his vehicle's side view mirror, after being hit with the second beanbag round, turn and start "to stumble as if he was trying to flee." (Doc. 101-2 at 41.) However, a reasonable jury might question this testimony given Defendant Wick's testimony that—when viewing Plaintiff through his side view mirror—he could only see Plaintiff from "above the head and around his waist, maybe a little bit below." (Doc. 101-2 at 37.) The video evidence appears to show Plaintiff get struck by the first beanbag round in his side, turn and take four steps away from the officers, get struck by the second beanbag round, then crouch and sit on the ground. (Doc. 101 Ex. 6 at 2:15–2:18.) The Court finds that a reasonable jury could conclude, at best, that a reasonable officer would interpret Plaintiff's turn and stumble as a short-lived attempt to evade arrest because Plaintiff clearly abandons this plan when he stops and crouches near Defendant Wick's vehicle. But also, given Plaintiff's testimony that the first beanbag round caused him to turn his body away

---

[1] Plaintiff's controverting statement of facts avers that the City of Mesa dropped the obstruction of justice charges against Plaintiff before his criminal trial. (*See e.g.*, Doc. 115 at 10 ¶ 42.) However, Plaintiff does not include evidence to verify this claim. Plaintiff cites to his Criminal Trial Transcript (Doc. 115-7 at 1) generally, but the transcript does not discuss the prosecutor dropping these charges. Therefore, the Court will not consider these assertions in this Order. *See Sandrasegaran v. Nationwide Gen. Ins. Co.*, No. CV-22-00962-SMB, 2023 WL 7686658, at *2 (D. Ariz. Nov. 15, 2023) ("[A] non-movant's bare assertions, standing alone, are insufficient to defeat a motion for summary judgment.").

- 11 -

from the officers and stumble forward, (doc. 115 at 32 ¶ 25), a reasonable jury could also conclude that a reasonable officer would interpret Plaintiff as reacting to the officer's use of force rather than evading it. Lastly, regarding this incident, a reasonable jury could find persuasive that a different jury found Plaintiff not guilty of resisting arrest. (Doc. 115-7 at 219–220.)

Finally, Defendants cite Plaintiff jerking his hands to his waist to support their claim that Plaintiff was attempting an aggravated assault. (Doc. 104 at 17.) However, Plaintiff's quick hand movement to his shirt immediately precipitated the *first* beanbag shot. Defendant Alexander deployed the *second* beanbag round after Plaintiff used both his hands to lift his shirt and revealed there was no gun concealed in his waistband and after Plaintiff turned his back toward Defendant and took four steps away. (Doc. 101 Ex. 6 at 2:15–2:18.) Therefore, viewing the evidence in a light favorable to Plaintiff, a jury could conclude that a reasonable officer would not believe Plaintiff was about to commit an aggravated assault at the time Defendant Alexander fired the second beanbag round.

### ii.    Imminent Threat

The "most important" *Graham* factor is whether the person "posed an immediate threat to the safety of the officers or others." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011). Defendants contend that Plaintiff posed an immediate threat to the officers and the public because he launched himself from the vehicle, made a fast movement to his waistband, failed to comply with commands, and walked away from officers toward the intersection. (Doc. 104 at 18.) The most salient fact to Defendants' argument is that Plaintiff quickly reached to his waist to lift his shirt after officers were informed there was a gun in the vehicle. However, a reasonable jury could believe Plaintiff's testimony that the officers instructed him to show he did not have a weapon. Moreover, a jury could conclude that the perceived threat materially changed once Plaintiff showed he did not have a weapon in his waistband and turned his back to the officers, which preceded both the second beanbag shot and taser deployment. Finally, a jury could conclude that the fact that Plaintiff was stumbling rather than running from the cops minimized the perceived threat

of escape to the officers and the public.

### iii.    Attempting to Resist or Flee

Defendants argue that "[t]wo bean-bag deployments, after Plaintiff jerked his hands to his waistband, did not stop Plaintiff's behavior and cause submission.  He instead continued to walk away from officers and toward the intersection distracting from the apprehension of Wheaton."  (Doc. 104 at 19.)  However, the video evidence readily contradicts this claim.  As noted, Defendants and Plaintiff both characterize Plaintiff's movements as stumbling away from the officers after the first beanbag shot.  The video evidence supports this characterization.  Therefore, a reasonable jury could conclude that Plaintiff did not intend to flee or evade arrest.  Further, after Defendant Alexander hit Plaintiff with the second beanbag round, Plaintiff immediately stopped and sat on the ground.  Therefore, it is incorrect for Defendants to state that the two beanbag rounds did not stop Plaintiff's behavior.  At best, Defendants can argue that Plaintiff's four stumbling steps, in response to the first beanbag shot, evidence an attempt to flee from officers.

### iv.    Other Factors

In addition to the three core factors, a courts may analyze: whether less intrusive alternatives were available; whether the suspect was given proper warnings before force was used; and the parties' relative culpability for creating the dangerous situation.  *See Cooper v. City of Mesa*, No. CV-22-01017-PHX-DJH (DMF), 2025 WL 1040374, at \*10 (D. Ariz. Mar. 7, 2025).

Defendants state that Plaintiff "was the conductor of his own chaos" due to his cursing at the officers, non-compliance, "erratic and jerky movements," and "resistance and flight."  (Doc. 104 at 20.)  However, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff demonstrated compliance.  First, Plaintiff obeyed the officer's commands to exit his vehicle through his window.  (Doc. 101 at 5 ¶ 40; Ex. 6 at 2:07–2:14.)  Second, according to Plaintiff, Plaintiff obeyed the officer's command to show he did not have a weapon.  Third, Plaintiff obeyed the officer's command to stop and get on the ground after being hit with the second beanbag round.

(Docs. 101 at 8 ¶ 57; Ex. 6 at 2:17–2:19.)

Plaintiff notes that Defendants did not give Plaintiff any warnings before using force. (Doc. 118 at 12.) This is "an important consideration" when evaluating the reasonableness of an officer's actions. *See Lowry*, 858 F.3d at 1259. Defendants do not dispute that they did not give warnings before using force. (Doc. 122 at 5 n.4.) Plaintiff adds there was no exigency preventing Defendants from giving a warning. (*Id.*) Specifically, Plaintiff explains that Defendant Wick saw Plaintiff in a crouched position before deploying his taser, so there was nothing preventing Defendant Wick from giving a warning. (*Id.*) Defendants respond that there was not enough time to give a warning. (Doc. 122 at 5 n.4.) This may be true as to Defendant Alexander's use of force, as it could be argued that Plaintiff was stumbling toward Defendant Wick's door thus necessitating immediate force. However, the same cannot be said of Defendant Wick's use of force.

### c. Weighing the Interests

Finally, the Court weighs whether the officer's "degree of force used was warranted by the governmental interests at stake." *Deorle*, 272 F.3d at 1282. Here, viewing the facts in a light favorable to Plaintiff, a jury could conclude that Defendants' use of force was not warranted given how many of the governmental interests could be framed to favor Plaintiff. Importantly, many of the facts are disputed, so "a jury should have the opportunity to assess the reasonableness of the force used after hearing all the evidence." *Glenn*, 673 F.3d at 878.

### 2. *Clearly Established Right*

Although a jury could find that Defendants violated Plaintiff's constitutional rights, an "official is entitled to qualified immunity unless the violated right was clearly established at the time of the incident." *Andrews v. City of Henderson*, 35 F.4th 710, 718 (9th Cir. 2022). A constitutional right is clearly established if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Hawatmeh v. City of Henderson*, 159 F.4th 591, 601 (9th

Cir. 2025) (citation modified) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).

Although the Supreme Court "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Rivas-Villegas*, 595 U.S. at 5 (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)). At bottom, Plaintiff must "identify a case where an officer acting under similar circumstances as [Defendants] was held to have violated the Fourth Amendment. *See Pauly*, 580 U.S. at 79. The Court finds that Plaintiff fails to carry this burden.

Plaintiff cites *Rice v. Morehouse*, 989 F.3d 1112, 1125–27 (9th Cir. 2021)—and the six cases it cites—to establish "that the use of a taser or beanbag shotgun against a suspect who is passively or even minimally resisting arrest—such as by continuing to walk toward officers despite orders to stop—offends the Constitution." (Doc. 118 at 18–19.) However, Plaintiff fails to establish that the *facts* of these cases are applicable here. *See City and County of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015) ("We have repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." (citation modified)). Therefore, Plaintiff's cited precedent "must place the lawfulness of the particular *action* beyond debate." *City of Escondido v. Emmons*, 586 U.S. 38, 44 (2019) (emphasis added) (citation modified).

Here, Plaintiff contests Defendants' use of a beanbag shotgun round and a taser shot. Of the seven cases Plaintiff identifies, only one concerns the use of beanbag shotgun: *Deorle*, 272 F.3d at 1278. And only two concern tasers: *Gavelet-Blondin v. Shelton*, 728 F.3d 1086 (9th Cir. 2013); and *Bryan*, 630 F.3d at 822. The other four cases concern materially different scenarios and uses of force. *See Rice*, 989 F.3d at 1117 (analyzing an officer's "take-down" maneuver during a traffic stop); *Nelson v. City of Davis*, 685 F.3d 867, 874 (9th Cir. 2012) (analyzing an officer's use of a pepperball gun at a block party); *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1128–29 (9th Cir. 2002) (analyzing officers' use of pepper spray on protestors who chained themselves together); *Young v. County of Los Angeles*, 655 F.3d 1156, 1159–60 (9th Cir. 2011) (analyzing an

officer's use of pepper spray and a baton during a traffic stop).  Accordingly, the Court will not consider these cases.  *See Kisela v. Hughes*, 584 U.S. 100, 104 (2018) ("Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent *squarely governs* the specific facts at issue" (emphasis added) (citation modified)).

The Court begins with the precedent related to the use of a beanbag shotgun.  Then the Court addresses the cases relating to the use of a taser.

a.  <u>Beanbag Shotgun</u>

*Deorle* is readily distinguishable.  There, officers responded to Deorle's home after his wife called 911 because he was suicidal, screaming, and banging on the walls of their house.  *Deorle*, 272 F.3d at 1276.  The officer in question, observed Deorle roam about his property for "thirty to forty minutes."  *Id.*  Importantly, there were no bystanders at the time.  *Id.* at 1282.  During this time, Deorle was agitated, shouted "kill me," and screamed at an officer that he would "kick his ass."  *Id.* at 1276–77.  Deorle also brandished a hatchet and an unloaded plastic cross-bow at different times but discarded both at the officers' requests.  *Id.*  The officer at question then "observed Deorle at close proximity for about five to ten minutes" before Deorle walked directly toward him, to which the officer fired a beanbag round.  *Id.* at 1278, 1281.  The beanbag round struck Deorle in the face and caused "multiple fractures to his cranium, loss of his left eye, and lead shot embedded in his skull."  *Id.* at 1278.  The officer neither warned Deorle that he was going to shoot, nor ordered him to halt.  *Id.*

In *Kisela*, the Supreme Court has considered *Deorle*'s ability to clearly establish a violated right.  There, the Court instructed the Ninth Circuit not to read *Deorle* "too broadly in deciding whether a new set of facts is governed by clearly established law."  584 U.S. at 106.  The *Kisela* Court found *Deorle* distinguishable from the case at hand, in part, because the suspect was "within striking distance" of the involved officer and the "situation unfolded in less than a minute."  *Id.*  Same too here.  At the time Plaintiff was struck with

- 16 -

the second beanbag round, he was right next to Defendant Wick's driver's side door. Additionally, from the time Plaintiff began crawling out of his car to being hit with the second beanbag round was approximately ten seconds. Moreover, unlike *Deorle*, Plaintiff was not emotionally disturbed, was in the middle of a street with multiple bystanders around, was observed within reaching distance of a firearm, and was hit in the buttocks by the beanbag round.

Therefore, the Court finds that *Deorle* does not squarely govern the facts of this case such that an officer would understand the constitutional question here to be beyond debate. Accordingly, the Court finds that Plaintiff fails to carry his burden in demonstrating that the rights at issue were clearly established at the time of the incident and holds that Defendant Alexander is entitled to qualified immunity.

### b. Taser

*Gravelet-Blondin* is also readily distinguishable. There, an officer tased a bystander observing the arrest. *Gravelet-Blondin*, 728 F.3d at 1090. The bystander was standing "some thirty-seven feet from" the suspect when the officer ran towards the bystander, told him to get back, began to warn him that he would be tased, but "fired his taser before he had finished giving that warning." *Id.* Importantly, the bystander at the time "made no threatening gestures," and seemed "frozen with fear" prior to being tased. *Id.* The "differences between that case and the case before us leap from the page." *Sheehan*, 575 U.S. at 614. Unlike the bystander in *Gravelet-Blondin*, Plaintiff was in the car with the suspect, had access to a firearm, argued with officers, quickly moved his hands to his waist, and took steps away from the officers but toward Defendant Wick's vehicle. Therefore, *Gravelet-Blondin* fails to squarely govern the facts of this case.

*Bryan* is not anymore helpful. There, an officer pulled over Bryan for failing to wear a seatbelt. *Bryan*, 630 F.3d at 822. To this, Bryan began to hit his steering wheel, yell expletives to himself, step out of his vehicle, yell gibberish, and hit his thighs. *Id.* Bryan then stood fifteen to twenty-five feet away from the officer and did not attempt to flee. *Id.* at 822, 827. Without giving a warning, the officer shot Bryan with his taser. *Id.*

at 822.  Importantly, Bryan never addressed or argued with the officer once he left his car. *Id.* at 828.  In contrast, Plaintiff was argumentative, cursing the officers, within feet of Defendant Wick's position, had arrest warrants, and did not stop moving until he was shot with two beanbag rounds.  Therefore, *Bryan* also fails to squarely govern the facts of this case.

Accordingly, the Court finds that Plaintiff fails to carry his burden in demonstrating that the rights at issue were clearly established at the time of the incident and holds that Defendant Wick is entitled to qualified immunity.

## IV.    CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment is **granted** (Doc. 104).

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter final judgment in favor of Defendants.

Dated this 9th day of March, 2026.

Honorable Susan M. Brnovich
United States District Judge